Patrice L. Bishop (182256)
pbishop@ssbla.com
**STULL, STULL & BRODY**
9430 W. Olympic Blvd., Suite 400
Beverly Hills, CA 90212
Tel: 310-209-2468
Fax: 310-209-2087

***Local Counsel for Plaintiff***

(Additional Counsel on Signature Page)

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| RONALD MARTIN, Derivatively on Behalf of Facebook, Inc.,<br><br>Plaintiff,<br><br>v.<br><br>MARK ZUCKERBERG, MARC L. ANDREESSEN, ERSKINE B. BOWLES, SUSAN D. DESMOND-HELLMANN, REED HASTINGS, JAN KOUM, SHERYL K. SANDBERG and PETER A. THIEL,<br><br>Defendants,<br><br>and<br><br>FACEBOOK, INC.,<br><br>Nominal Defendant. | Case No. 3:18-cv-01834<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Ronald Martin (Plaintiff"), by and through his undersigned counsel, for his Verified Shareholder Derivative Complaint for the benefit of Nominal Defendant Facebook, Inc. ("Facebook" or the "Company"), against certain members of its Board of Directors (the "Board"), alleges as follows:

**NATURE OF THE ACTION**

1. This is a derivative action brought by Plaintiff on behalf of Facebook against certain members of its Board, the individually named defendants (the "Individual Defendants") herein, for their conscious disregard of their fiduciary duties and their failure to oversee and monitor the Company and its policies, among other things. This action (the "Action") is being brought in order to recover the damage which Facebook has and will continue to suffer as consequence of the wrongdoing alleged herein.

2. Facebook, an almost omnipresent social networking site, is presently in the throes of a world-wide scandal arising from the mining and misuse of its customer information by Cambridge Analytica ("Cambridge"), a United Kingdom entity. The scandal and ensuing damage to the Company has been caused by Facebook's lack of a comprehensive and effective privacy protection program in relation to the private information of its users, and its laisse faire attitude toward the private data that it publicly represented to keep confidential. The scandal and ensuing damage has also been caused by its inadequate response to Cambridge once it learned of the data breach.

3. In dealing with Cambridge, as Facebook's chief executive officer, Mark Zuckerberg ("Zuckerberg") recently publicly stated, the Company breached its duty of trust to its customers. As Zuckerberg stated, "[w]e have a responsibility to protect your data and if we can't then we don't deserve to serve you." *See* https://www.nytimes.com/2018/03/21/technology/facebook-zuckerberg-data-privacy.html.

4. According to news reports, commencing in about 2013, Cambridge, through an on-line application or App, called "Thisisyourdigitallife" (the "App"), obtained private information from Facebook customers and their Facebook "friends" and family members, and used that

information to create profiles of U.S. citizens, primarily for use in the United States' elections of 2016.

5. By mining and analyzing this information, Cambridge was able to create targeted political campaign advertisements that may have influenced the last presidential election. It has been reported that Cambridge has information on over 50 million American citizens, which it obtained by mining that information from Facebook through the use of its App, which pulls in information not only for the users of the App, but their friends and family.

6. Cambridge was able to do this because of Facebook's lack of privacy controls and its failure to institute sufficient protection policies against third party misuse of its customers' information – a continuing issue for the Company since at least 2011.

7. Since at least that time period, senior programmers at the Company have been telling senior executives that that the Company's lax attitude toward customer privacy, and in particular, its lack of control over third party use of its customers' private information, could result in a major breach. Former Facebook platforms manager, Sandy Parakilas ("Parakilas"), for instance, has been quoted in the press as stating that he warned Facebook senior managers in 2011 that "all of the data that left Facebook servers to developers could not be monitored by Facebook, so [Facebook] has no idea what developers were doing with the data." *See* https://www.theguardian.com/news/2018/mar/20/facebook-data-cambridge-analytica-sandy-parakilas.

8. By 2011, moreover, Facebook was subject to an investigation by the Federal Trade Commission ("FTC") concerning the degree to which Facebook allowed its extensive profile information collected on each of its customers to be accessed by third parties through platform applications, and about certain changes by Facebook which effectively made public in new ways certain of its customers' information.

9. In the settlement of the FTC's action, on November 29, 2011, Facebook entered into a consent decree (the "2011 Consent Decree") in which it agreed, among other things, not to mispresent the extent to which it maintained the privacy of its customers' information, and to clearly tell customers that it was sharing their private information with a third party before it did

so. The promises not to misrepresent and share use data without users' prior consent was at the core of Facebook's obligation in the agreement, as it paid no fines.

10. The 2011 Consent Decree further required Facebook to establish and institute a comprehensive privacy program designed to address privacy risks and to protect the privacy and confidentiality of its customers' information.

11. Nonetheless, in 2015, Facebook first learned from an article in the *Guardian* that Cambridge, and its parent company, Global Science Research ("Global Science"), had collected massive amounts of private user information through the App, and that it had misused this information for commercial purposes.

12. Given the absence of sufficient privacy protection controls, and its general laisse faire attitude toward privacy, as now admitted by Zuckerberg, the Company did little in response to this massive breach of privacy other than ask Cambridge to eliminate the information and, in a dilatory fashion, ask the those associated with Cambridge to submit "certifications" that such information has been deleted.

13. As Zuckerberg himself admitted in a recent television interview with CNN, he and Facebook made "mistakes" in the handling of Cambridge after the Company learned of its major data breach, including failing to inform its customers of this massive data breach. He further admitted that the Company had more to do to keep its customers' information safe and private and to get third party use of Facebook information under control. This sentiment was echoed by Sheryl Sandberg ("Sandberg"), who posted a note stating, "we know that this was a major violation of people's trust, and I deeply regret that we didn't do enough to deal with it." *See* http://www.businessinsider.com/facebook-ceo-mark-zuckerberg-responds-to-cambridge-analytica-scandal.

14. Only now, after this breach has occurred and the private information of over 50 million Americans has been misused (and a U.S. presidential election potentially influenced), has Zuckerberg announced plans that the Company intends to take, including reviewing all third party apps, investigating any app that has large amounts of private information gleaned from Facebook, investigating any "sketchy" app, and restricting access to information by third parties. Zuckerberg

also announced that the Company intends to investigate and review the thousands of apps that now have access to customers' private information and that the Company will undertake a forensic audit if necessary—all steps which should have been in place well before Cambridge had access to customer information

15. Facebook and its Board's failure to ensure that the Company had in place a comprehensive privacy protection policy, even after the 2011 Consent Decree, and to timely inform customers of this breach, constitute a breach of their fiduciary duties to the Company, a failure of oversight, and a potential breach of the 2011 Consent Decree, which was required to be reviewed by every current and future director.

16. As a consequence of this wrongdoing, Facebook has lost over $50 billion in market capitalization, is the subject of numerous government investigation in the United States and abroad and is the subject to both consumer and federal securities class actions.

17. Moreover, there is a massive grassroots movement by customers called #DeleteFacebook to cancel their Facebook accounts in light of the abject failure by Facebook to secure their private information, and its failure to have timely informed customers of this disreputable data breach by Cambridge.

18. This Action seeks to recover the damage which the Company has sustained and will continue to sustain as a result of the Individual Defendants' wrongdoing in failing to institute and/or oversee the Company's privacy protection program, to evaluate its adequacy, including the Company's response to disclosures concerning Cambridge, and to ensure the Company's continued conformance to the 2011 Consent Decree. It further seeks to hold them liable for their failure to sufficiently oversee the Company's inadequate response to Cambridge, once it learned of this massive breach.

## PARTIES

19. Plaintiff has been a shareholder of Facebook since 2012 and is a resident of Florida.

20. Nominal Defendant Facebook is incorporated in Delaware and has its principal executive offices at 1601 Willow Road, Menlo Park, California 94025.

21. Defendant Zuckerberg is Facebook's founder, has served as its Chief Executive Officer (CEO) and as a member of its B since July 2004, and is a resident of California.

22. Defendant Peter A. Thiel ("Theil") has served as a member of the Company's Board since April 2005 and is a resident of California.

23. Defendant Marc L. Andreessen ("Andreessen") has served as a member of the Board since June 2008 and is a resident of California.

24. Defendant Reed Hastings ("Hastings") has served as a member of the Board since June 2011 and is a resident of California.

25. Defendant Erskine B. Bowles ("Bowles") has served as a member of the Board since September 2011 and is a resident of North Carolina.

26. Defendant Sheryl K. Sandberg ("Sandberg") has served as the Chief Operating Officer (COO) since March 2008, as a member of the Board since June 2012, and is a resident of California.

27. Defendant Susan D. Desmond-Hellmann ("Desmond-Hellman") has served as a member of the Board since March 2013 and is a resident of California.

28. Defendant Jan Koum ("Koum") has served as a member of the Board since October 2014 and is a resident of California.

29. Zuckerberg, Theil, Andreessen, Hastings, Bowles, Sandberg, Desmond-Hellman, and Koum, together are hereinafter referred to as the "Individual Defendants".

**JURISDICTION AND VENUE**

30. This Court has jurisdiction under 28 U.S.C. §1332 because Plaintiff and Defendants are each citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. This Action is not a collusive action designed to confer jurisdiction on the United States District Court that it would not otherwise have.

31. This Court has jurisdiction over each Defendant because each Defendant is either a corporation that maintains its executive offices within this District, conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts

within this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

32. Venue is proper under 28 U.S.C. §1391(a) because Facebook maintains its executive offices within this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities which had an effect in this District.

## DEFENDANTS' FIDUCIARY DUTIES

33. As directors of Facebook, and fiduciaries to Facebook and its shareholders, the Individual Defendants owed Facebook and its shareholders obligations of good faith, loyalty, and candor, and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Facebook and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Moreover, they are not to operate the Company in an illegal manner, even if it results in revenue for the Company. Each Director of the Company owes Facebook and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. The Defendants further owe the Company a duty of oversight and, here, where the Company has already been subject to a consent decree on the very issues that are implicated by the Cambridge scandal, the duty to ensure that the Company has a full and comprehensive privacy protection program, including provisions to enforce this program, consistent with the 2011 Consent Decree.

## SUBSTANTIVE ALLEGATIONS

### Facebook Operates by Selling Access to Private Information

34. Facebook is the world's largest social networking site with over 1.4 billion users per day and has penetrated at least 60 countries around the world. It is powerful enough to influence elections, wars and major world events.

35. It operates a social networking website that allows people to communicate with their family, friends, and coworkers, and develops technologies that facilitate the sharing of information, photographs, website links, and videos. Facebook users have the ability to share and restrict information based on their own specific criteria.

36. Facebook uses this information provided by its users to help advertisers and developers better target potential customers, for which it earns almost the entirety of its billions in revenues. Last year alone, Facebook made 98% of its revenue from advertising, giving it over $39 billion in revenue.

37. Since about 2007, Facebook has operated the Facebook Platform, which is a set of tools and programming interfaces that enable third parties to develop, run and operate software, such as games and quizzes, with which users can interact. Facebook has designed this Platform such that Platform Applications can access user profile information, in certain instances, thereby providing these third party users with private information about Facebook users.

38. Presumably to avoid the type of abuse giving rise to the Cambridge scandal, Facebook maintains a Data Use Policy on its website which specifically states, "Your trust is important to us, which is why we don't share information we receive about your with others unless we have . . . received your permission . . . given you notice, such as by telling you about it in this policy; or removed your name an any other personally identifying information from it." https://www.facebook.com/full_data-use.policy.

**Facebook and its Board Are on Notice that the**
**<u>Company has Lost Control of its Third Party Information</u>**

39. However, Facebook has been on notice since at least 2011 that it has repeatedly violated its own Data Use policy and that it has lost control of the data that it has been supplying to third parties, but it and the Board have failed to take adequate action.

40. In 2011, for instance, Parakilas, a former Facebook platforms operations manager for policing data breaches by third party software developers between 2011 and 2012, stated that as many as hundreds of millions of Facebook users are likely to have had their private information harvested by companies that exploited the same terms as the company involved with Cambridge.

41. Parakilas, a whistleblower, has stated that while he was at Facebook, he specifically had concerns that Facebook had no idea what happened to third party data once it left Facebook's servers, and that he had warned senior executives that the Company risked a major data breach as a result of this third-party use of its data.

42. Parakilas said that the Company failed to use its enforcement mechanisms, including audits of external developers, to ensure that data was not being misused, and that recent disclosures about Cambridge have left him disappointed that his superiors did not heed his warning. In fact, he is quoted as stating, "it has been painful watching because I know that they could have prevented it" and said that as far as control over this information, Facebook had "zero" or "absolutely none" once the data left Facebook servers. While he was at Facebook, moreover, he was further discouraged when he suggested that Facebook commence audits to determine how its private information was being used.

43. Although the Company did make some changes in 2014 to third party access, it abjectly failed to take any steps to determine the use of its customers' data by third parties that had already occurred. According to Parakilas, while executives were nervous about the commercial value of the data being passed around to other companies, they failed to take a more rigorous approach or determine what had happened to the information. They further failed to disclose to their users that this information had been taken by third parties.

44. As Parakilas said, "[Facebook] felt that it was better not to know." *See* https://www.theguardian.com/news/2018/mar/20/facebook-data-cambridge-analytica-sandy-parakilas.

**Facebook Enters Into a Consent Decree with the FTC Over the Issue**

45. By 2011, Facebook also was under investigation by the FTC for, among other reasons, misrepresenting to its users the degree to which their information was being shared.

46. Specifically, the FTC claimed that Facebook had been engaging in "unfair and deceptive practices" by making public data that its users considered to be private, including both "profile information", such as a user's name, gender, email address and birthdays and, in some cases, more detailed information including a user's: "Profile Picture; ii. Hometown; iii. Interested

in (*i.e.*, whether a user is interested in men or women); iv. Looking for (*i.e.*, whether a user is looking for friendship, dating, a relationship, or networking); v. Relationships (*e.g.*, marital or other relationship status and the names of family members); vi. Political and Religious Views; vii. Likes and Interests (*e.g.*, activities, interests, music, books, or movies that a user likes); and viii. Education and Work (*e.g.*, the name of a user's high school, college, graduate school, and employer." FTC Complaint at 2 (This is the very same information that that Cambridge would later obtain from Facebook and disseminated to third parties).

47. By the terms of the 2011 Consent Decree that Facebook opted to sign, it agreed to establish and maintain "a comprehensive privacy program" that would address privacy risks and protect people's information.

48. Furthermore, Section VII of the Consent Decree ensured that all current and future Board members of Facebook be provided with the Consent Decree, such that they were aware of its requirement that the Company institute and maintain a comprehensive privacy protection program, presumably encompassing a method for determining whether the Company's data had been misused or breached in the past, and enforcement procedures in the event of a breach.

49. Specifically, the 2011 Consent Decree stated:

> IT IS FURTHER ORDERED that Respondent shall deliver a copy of this order to (1) all current and future principals, officers**, directors**, and managers; (2) all current and future employees, agents, and representatives having supervisory responsibilities relating to the subject matter of this order, and (3) any business entity resulting from any change in structure set forth in Part VIII. Respondent shall deliver this order to such current personnel within thirty (30) days after service of this order, and to such future personnel within thirty (30) days after the person assumes such position or responsibilities. For any business entity resulting from any change in structure set forth in Part VIII, delivery shall be at least ten (10) days prior to the change in structure. [Emphasis added].

50. Commenting on the Cambridge scandal in light of the 2011 Consent Decree, Former Deputy Director of the FTC's Bureau of Consumer Protection, Jessica Rich ("Rich") recently stated "I think there would be a strong concern that Facebook's failure to oversee third-party access to user data fell short of these requirements [those set forth in the 2011 Consent

Decree].” *See* https://qz.com/1233597/did-facebook-violate-its-ftc-agreement-heres-what-investigators-will-ask.

51. Rich further stated that in light of the 2011 Consent Decree “When people agree to the settings, would they have anticipated that Facebook would fail to monitor third party access to their data, and fail to enforce its own policies?” *See* https://qz.com/1233597/did-facebook-violate-its-ftc-agreement-heres-what-investigators-will-ask.

52. Even though the 2011 Consent Decree prohibited Facebook from misrepresenting to its users the extent to which their data would used by third parties – it did exactly that by failing to disclose the Cambridge data breach even after Facebook learned of it.

53. By 2014, the Company also was the subject of several class actions alleging that it was illegally data mining and selling customers’ private information, some of which the Company settled. *See, e.g., Campbell, et al. v. Facebook, Inc.*, Case No. 4:13-cv-05996 (N.D. Cal.) (charging Facebook with data mining customers’ private URLs, and providing third parties with that information).

**The Cambridge Scandal Is Disclosed**

54. Cambridge is a privately held company that combines data mining and data analysis with strategic communication for the electoral process. Cambridge was created in 2013 by its British parent company SCL Group, Limited.

55. In 2015, it became known as the data analysis company retained by the Ted Cruz presidential primary campaign. After that campaign failed in 2016, however, it was retained by the Donald Trump presidential campaign.

56. The Cambridge scandal first came to light on March 17, 2018, when the *New York Times* published an investigative report entitled “How Trump Consultants Exploited the Facebook Data of Millions.”

57. That article revealed that Cambridge had used the data of 50 million people obtained from Facebook for targeted political advertisements without making proper disclosures or obtaining permission of the owners of that information. The article stated in relevant part:

> [T]he firm harvested private information from the Facebook profiles of more than 50 million users without their permission, according to former Cambridge employees, associates and documents, making it one of the largest data leaks in the social network's history. The breach allowed the company to exploit the private social media activity of a huge swath of the American electorate, developing techniques that underpinned its work on President Trump's campaign in 2016.
>
> * * *
>
> But the full scale of the data leak involving Americans has not been previously disclosed — and Facebook, until now, has not acknowledged it. Interviews with a half-dozen former employees and contractors, and a review of the firm's emails and documents, have revealed that Cambridge not only relied on the private Facebook data but still possesses most or all of the trove.

https://www.nytimes.com/2018/03/17/us/politics/cambridge-analytica-trump-campaign.html

58. Co-founder and former contractor of Cambridge, Christopher Wylie ("Wylie"), the individual who brought to light the exposure of Facebook users' data, revealed how the data mining worked: "With their profiles, likes, even private messages, [Cambridge] could build a personality profile on each person and know how best to target them with messages." www.theguardian.com/news/2018/mar/17/data-war-whistleblower-christopher-wylie-faceook-nix-bannon-trump.

59. Wylie stated that he had receipts, invoices, emails, legal letters and records that "showed how, between June and August 2014, the profiles of more than 50 million Facebook users had been harvested." (http//www.theguardian.com/news/2018/mar/17/data-war-whistleblower-christopher-wylie-faceook-nix-bannon-trump). These profiles "contained enough information, including places of residence, that [Cambridge] could match users to other records and build psychographic profiles." NYTimes, 3/17/18, "How the Trump Campaign Exploited Facebook Data of Millions."

60. Facebook has admittedly known about the improper use of its customers' private data by affiliates of Cambridge since 2015, when the *Guardian* first revealed this data breach.

61. Rather than take appropriate measures to rectify this situation consistent with both the 2011 Consent Decree and its own Data Use policy requiring it to tell customers when their private data has been shared (and to obtain their permission prior to such sharing), Facebook took

a fairly laisse faire stance, asking Cambridge's associates to delete the information, and then, almost a year later according to some reports, requiring them to execute a "certification" that such information was deleted (when in fact it was not). In fact, the NY Times has indicated that it was recently able to view a set of raw data from the profiles Cambridge Analytica obtained. *See* https://www.nytimes.com/2018/03/17/us/politics/cambridge-analytica-trump-campaign.html .

62. Facebook's response effectively swept the issue of this massive data breach in which private user information was used for nefarious commercial and political purposes under the proverbial rug. In fact, some reports indicate that Facebook was well aware as recently as 2016, that Cambridge used the ill-gotten data for the 2016 presidential campaign, as Facebook employees were in the room when such information was being used by Cambridge to influence the 2016 presidential election.

63. Moreover, in his recent "mea culpa" series of interviews and posts, Zuckerberg admitted that the Company only learned last week—almost three years later--that Cambridge did not eliminate all of the misused data. Zuckerberg Facebook Post, March 22, 2018.

**Facebook and its Board Failed to take Appropriate Action**

64. Facebook and its Board were aware of the requirements under the 2011 Consent Decree. Nonetheless, they failed to maintain a sufficient and comprehensive privacy protection program which would have prevented the breach in the first instance, and then failed to take appropriate steps given the absence of an adequate program, when addressing the Cambridge data breach in 2015. Their actions, constitute actionable wrongdoing which resulted in damage to the Company. Their actions further constituted a violation of the Company's own Data Use Policy.

65. Contrary to the 2011 Consent Decree, the Company failed to have a sufficiently robust privacy protection program to avoid the misuse of private user information by third parties, or to have sufficient enforcement mechanisms to address a possible breach of that program by a third party.

66. In his recent "mea culpa" set of interviews and Facebook post, Zuckerberg admits that he and the Company made a mistake in its handling of the Cambridge matter once it was disclosed. He further admits that the Company only now is going to institute a set of measures

that include auditing various third party applications and reviewing the thousands of applications with access to Facebook private information to determine which have too much private information and which applications seem "sketchy", among other things. His statements make clear that up to this point the Company lacked a robust privacy protection program as required by the 2011 Consent Decree, and that the Board, who had the duty to oversee such a privacy protection program, failed in its duties.

67. Moreover, he further admitted that the Company should have disclosed this breach in a timely manner to its users, and that only now is it going to create a tool to enable users to determine whether they have been the subject of the breach.

68. Once again, the Company's conduct in failing to timely disclose this breach to its users as it is now doing, in violation of a Data Use Policy which was known or should have been known to its Board members, constitutes a breach of their duty of oversight and actionable misconduct.

69. Facebook's Data Use Policy advised Facebook users, in part:

> Granting us permission to use your information not only allows us to provide Facebook as it exists today, but it also allows us to provide you with innovative features and services we develop in the future that use the information we receive about you in new ways.
>
> While you are allowing us to use the information we receive about you, you always own all of your information. ***Your trust is important to us,*** *which is why we don't share information we receive about you with others unless we have:*
>
> - *received your permission*;
> - *given you notice,* such as by telling you about it in this policy; or
> - removed your name and any other personally identifying information from it. [Emphasis added.]

https://web.archive.org/web/20180322150542/https://www.facebook.com/full_data_use_policy.

70. Nonetheless, by failing to timely disclose the Cambridge data breach, Facebook violated the policy. The reason for its failure is clear, Facebook makes almost the entirety of its revenue through the sale of targeted user information to advertisers and developers.

71. Any attempt to shut down Cambridge would have negatively impacted its ability to attract other developers and its bottom line. Thus, Facebook, and Zuckerberg, its controlling

shareholder, had every incentive to take only the most superficial steps in response to the Cambridge breach.

72. The Board has further failed in its duty of oversight resulting in the inflation of the Company's financials and misrepresentations that were made to the market.

**Zuckerberg Admits that He and the Company Breached their Trust**

73. Within days of the news media's disclosure of the Cambridge scandal, Zuckerberg was forced to address the issue in a series of interviews, including one with the New York Times, another with CNN, and in a detailed Facebook post.

74. For the most part, Zuckerberg admitted that his conduct and that of the Company breached users' trust, and that he and the Company made mistakes. He further admitted that "there was more to do" and that the Company needed to "step up and do it," including doing a full forensic audit of Cambridge, apparently for the first time, and promoting an existing tool that helps users revoke permissions of apps accessing their data.

75. Despite these admissions, however, experts, such as Jonathan Albright, a research director at the Tow Center for Digital Journalism, stated that, Zuckerberg "avoided the big issue, which is that for many years, Facebook was basically giving away user data like it was handing out candy." *See* https://www.nytimes.com/2018/03/21/technology/facebook-zuckerberg-data-privacy.html.

**Facebook Has Suffered and Will Continue to Suffer Significant Damage as a Result of the Individual Defendants' Misconduct**

76. The fallout from the Cambridge scandal on the Company has been overwhelming.

77. On March 19, 2018, Bloomberg disclosed that the FTC is "probing whether Facebook violated terms of a 2011 consent decree of its handling of user data that was transferred to Cambridge Analytica without [user] knowledge."

78. On March 20, 2018, several media outlets reported that the U.K. Parliament had summoned Zuckerberg to give evidence over the scandal involving Cambridge. In addition, leading Democrats in the U.S. Senate also called on Zuckerberg to testify. Sen. Dianne Feinstein of California, the top Democrat on the Senate Judiciary Committee, called Facebook's latest

privacy scandal a "danger signal." She has threatened that she wants Zuckerberg's assurances that Facebook is prepared to take the lead on security measures that protect people's privacy — or else Congress may step in.

79. Several states attorneys general, including those of Massachusetts and New York have called for investigations of Facebook, and the ICO in the U.K. is presently investigating the Company.

80. It is the subject of numerous class actions for breach of privacy laws, and federal securities laws violations and it has lost about $50 billion in market capitalization.

81. In addition, it has suffered the loss of customer confidence as reflected in the recent #DeleteFacebook movement calling on users to cancel their accounts.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

82. Plaintiff has held shares in Facebook during the period of the wrongdoing alleged above and continues to hold Facebook stock.

83. Plaintiff will adequately and fairly represent the interests of Facebook and its shareholders in enforcing and prosecuting Facebook's rights, and has retained counsel who are competent and experienced in shareholder derivative litigation

84. Plaintiff has not made a pre-suit demand on the Board to institute an action against the Individual Defendants arising from the wrongdoing alleged herein as such a demand would have been futile.

85. As described above, the Individual Defendants, constituting a majority of the Board, were aware of both the terms of the 2011 Consent Decree, including its requirement that the Company have a robust privacy protection program, and the Company's publicly available Data Use policy. They had the duty and obligation to ensure that the Company conformed to both the Decree and the policy.

86. The facts giving rise to the Cambridge scandal and its aftermath demonstrate that in fact the Company neither had a comprehensive privacy protection program nor had it taken sufficient steps to conform to the 2011 Consent Decree, as legally required. This is so despite the fact that the Company had been involved in numerous class and other actions alleging the

Company's misuse of third party data, and the Board's knowledge of the Cambridge breach. In fact, the steps that Zuckerberg has recently announced are steps that should have been incorporated into the Company's policy and taken when the Company first learned of the Cambridge breach.

87. Moreover, to date the Company still had not followed its own Data Use policy, requiring it to inform users when their information is being used by a third party, particularly with regard to Cambridge.

88. As directors of the Company, the Individual Defendants have failed to properly oversee and monitor the Company, as they are required to do and as the Consent Decree requires them to do. Their failure to do so, and their conscious disregard for their duties, including their duty to monitor enforcement of the 2011 Consent Decree, and follow the Company's Data Use policy, has resulted in damage to the Company.

89. Further, as asserted in the federal securities action, the Defendants knew or were reckless in not knowing that statement they made to the public concerning the Company's actions toward its users' privacy were artificially inflating the price of the stock.

90. As such, there is a substantial basis for liability against a majority of the Board, such that a pre-suit demand on the Board would have been futile.

91. Further, Zuckerberg has admitted that he made mistakes and that much of the fault for the Cambridge scandal is his. Therefore, any pre-suit demand upon the Board would require that the Board make a determination to sue him.

92. Facebook, however, is a controlled company in which Zuckerberg owns and controls the majority of the voting power through his Class C shares. Therefore, it would have been impossible for the Board to make a determination to take action and commence suit against Zuckerberg on behalf of the Company, as Zuckerberg could vote out and remove any director seeking to sue him on behalf of the Company. *See* https://www.cnbc.com/2018/03/20/shareholders-wont-force-zuckerbergs-hand-in-facebook-management.html; https://www.thestreet.com/story/14527562/1/should-facebook-get-rid-of-mark-zuckerberg.html.

93. In fact, the same Board members at issue here voted to give Zuckerberg this voting power to keep him in office regardless of his conduct or misconduct, allowing him to maintain his position for life. Therefore, any demand upon them to take action against Zuckerberg for his admitted wrongdoing would have been futile.

**COUNT I**

**Against the Individual Defendants for Breach of Fiduciary Duty**

94. Plaintiff incorporates and realleges all allegations contained in the preceding paragraphs as if fully set forth herein.

95. The Individual Defendants are fiduciaries of the Company and its stockholders. As such they owe the Company the highest duties of good faith, loyalty and due care. The Individual Defendants' breaches of their fiduciary duties, which included intentional misconduct and knowing violations of the 2011 Consent Decree, directly and proximately caused substantial losses to the Company in an amount to be proven at trial.

96. The Individual Defendants acted with a bad faith, conscious disregard of their fiduciary duties, and in intentional dereliction of their duties, by failing to ensure that the Company comply with the 2011 Consent Decree and Facebook's own publicly stated policies about dissemination of user "profile information" to third parties and their dissemination of materially false and misleading statements.

97. As a result, the Individual Defendants disregarded numerous red flags alerting them to Facebook's violation of the 2011 Consent Decree and of misuse of customer data by third parties as further stated above, including laws suits, and disclosure in 2015 of the Cambridge data breach.

98. Accordingly, the Individual Defendants breached their duty of good faith.

99. The Individual Defendants are liable to the Company as a result of the acts alleged herein.

100. Plaintiff, on behalf of Facebook, has been damaged in an amount to be determined at trial.

**COUNT II**

**Against the Individual Defendants for Waste of Corporate Assets**

101. The Individual Defendants wasted Facebook's corporate assets by failing to conduct proper due diligence and thus causing the Company to be subject to numerous law suits, government investigations and the loss of approximately $50 billion in market capitalization, among other things.

102. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company for damages in an amount to be determined at a trial of this Action.

103. Plaintiff, on behalf of Facebook, has been damaged in an amount to be determined at trial.

**REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment as follows:

A. Declaring that Plaintiff may maintain this derivative action on behalf of Facebook and that Plaintiff is an adequate representative of the Company;

B. Declaring that the Individual Defendants have breached their fiduciary duties to Facebook;

C. Determining and awarding to Facebook the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with interest thereon;

D. Awarding Facebook actual, compensatory, and exemplary damages;

E. Awarding reasonable and necessary attorneys' fees and costs;

F. Awarding pre-and post-judgment interest; and

G. Granting such other and further relief as this Court deems just and equitable.

///

///

///

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated: March 23, 2018

By: *s/ Patrice L. Bishop*

Patrice L. Bishop
STULL, STULL & BRODY
9430 West Olympic Blvd., Suite 400
Beverly Hills, CA 90212
Tel: (310) 209-2468
Fax: (310) 209-2087
Email: service@ssbla.com

*Local Counsel for Ronald Martin, Derivatively on Behalf of Nominal Defendant Facebook, Inc.*

Lynda J. Grant
THEGRANTLAWFIRM, PLLC
521 Fifth Avenue, 17th Floor
New York, NY 10175
Tel: (212) 292-4441
Fax: (212) 292-4442
Email: lgrant@grantfirm.com

*Lead Counsel for Ronald Martin, Derivatively on Behalf of Nominal Defendant Facebook, Inc.*